No. 5062.

(Court of Appeal, Parish of Orleans.)

## J. G. ROCHE & SONS vs. F. WILLIAM ARMBRUSTER ET AL.

Stafford, Lambert & Robinson for plaintiff and appellant.

H. M. Ansley for defendant and appellee.

GODCHAUX, J.—Plaintiff firm does not seriously question the correctness of the conclusions of the lower Court with respect to the extent to which its claim as undertaker was allowed; and as our investigation of the record leads us to the same conclusions, we quote in full, and adopt the opinion of the trial Judge in regard thereto:

"Mrs. Grace Armbruster, alias Eggleston, died in this city on February 9, 1909, leaving no known relatives. Her succession was immediately opened by the public administrator, whose attorney requested plaintiffs to give her a funeral in keeping with her station in life, stating that she had some money and diamonds. No price was mentioned. Plaintiff embalmed the body, clothed it in a satin wrapper, placed it in a wooden coffin, copper-lined, removed it to their funeral parlors, kept it there for forty-eight hours and interred it in a vault secured by them for the space of one year in Girod Street Cemetery.

"On February 16, 1909, defendant, F. William Armbruster, presented to the Court, for probate, the last will of the deceased, instituting him her universal legatee, and appointing him her testamentary executor. Letters testamentary were issued to Armbruster, and an inventory of the decedent's estate was ordered to be taken.

"The inventory showed movables, $1,082.10; cash $300.00; jewelry, $1,117.50; real estate, $6,000.00; a total of $8,499.60. Armbruster claimed that some of

the jewelry, amounting to $405.00, was his personal property and should not be included in the inventory, thereby reducing the total to $8,094.60.

"On February 26, 1909, Armbruster was, on his petition, recognized as universal legatee of the deceased, and sent into possession of her estate by judgment of Court.

"On March 9th, following, plaintiffs brought this action against him and the succession of Armbruster, alias Eggleston, on their account for funeral expenses:

"The items claimed were:

| | |
|---|---|
| 1 black cloth casket (copper-lined).... | $450.00 |
| 1 satin wrapper .................... | 35.00 |
| 5 carriages at $5.00................ | 25.00 |
| 1 hearse ........................... | 15.00 |
| Embalming ......................... | 50.00 |
| Removing remains to funeral parlors.. | 5.00 |
| Use of parlors..................... | 10.00 |
| Vault ............................. | 50.00 |
| A total of........................ | $640.00 |

"The defense is that the bill sued on is out of all proportion; that plaintiffs have over-charged each and every item of service rendered, and of merchandise furnished, and that their true and real value is the sum of $150.00, which defendant has tendered to plaintiffs, and which they have refused to accept.

"The authority of the public administrator's attorney to order the funeral is not disputed. The question is whether it was proportionate to defendant's means, and whether the charges were legitimate.

"Funeral charges of $640.00, not inclusive of a permanent resting place, are extravagant for a per-

son possessed of an estate of only $8,000.00, with an admitted liability for rent of $360.00, a creditor's claim of $396.19, and law charges not stated.

"As to the several items set forth, it has been made to appear that the price of a coffin varies according to the financial condition of the deceased. It is fifty dollars for one, and five hundred dollars or more for another, according to the undertaker's knowledge or estimate of the decedent's means. Because they are sometimes called upon to bury poor people for little or nothing, it is thought legitimate by undertakers to even up on the wealthy.

"The coffin in this case is catalogued as No. 103. Whether made of oak, cypress or cedar, the evidence leaves in doubt. With the trimmings added its cost price was $250.00, more or less—so John G. Roche, one of the plaintiff firm, swore with much hesitation. The usual price charged for such a coffin is $450.00. That is exorbitant. A coffin of $250.00 would, in my opinion, have been rich enough for the deceased.

"Satin wrappers cost as low as seven dollars, and as high as fifty dollars. The reason assigned by Roche for selecting a thirty-five-dollar one was that the deceased was a beautiful woman, who could afford a fine funeral, and he fitted her up in style. Roche evidently wanted to make her an attractive sight for the curiously-inclined persons who would be drawn to his funeral parlors to look at her. The defendant should not be made to pay for the advertisement thus secured. The charge for the wrapper must be reduced to fifteen dollars.

"Of the five carriages charged for, two were used by the pallbearers. The other three, as stated by Roche, were furnished to 'a lot of people assembled there (at the funeral parlors) to go to the funeral.'

— 479 —

Whether they were acquaintances of the deceased, or persons who simply wanted to take a ride, Roche didn't know. As, however, they may have been acquaintances, the number of carriages is not excessive. That item is, therefore, allowed.

"Hearses, also, vary in price, according to circum‚ stances. No. 1 costs $15.00, No. 2, $10.00, and No. 3, $8.00. They fill the same purpose, and the reason for the difference in price is that No. 1 is in the latest style, No. 2 is in the late style, and No. 3 is entirely out of style. **Semble** that an eight-dollar hearse was all that was needed for one whose acquaintances, desirous of following her remains to the grave, required only three carriages.

"The cost of embalming, too, depends on the financial status of the deceased. For cavity work, as low as fifteen dollars is charged; for arterial embalming, Roche testified to having received as high as one hundred dollars. Embalming, however, is a luxury, not essential to proper burial, and, unless specially ordered cannot be charged for.

"It is not apparent why the deceased could not have been buried from the place where she died, or why her body had to be removed to plaintiff's funeral parlors, unless possibly, to advertise the latter. As, however, a charge would have been made for watching the remains at home, I will not disallow the item of five dollars for removing them.

"Ten dollars seems to be the usual charge for the use of funeral parlors decorated with ferns on such occasions. That item is allowed.

"The vault in which the deceased was interred was only a temporary resting-place secured for the term of one year. The price was fifty dollars, payable thirteen dollars cash, and the balance of thirty-

seven dollars at the expiration of one year. Plaintiffs paid the cash portion, but will not be called upon to pay the balance because the body was exhumed within one month, and re-interred in another cemetery. They are entitled to reimbursement for the thirteen dollars paid by them, and no more.

"The succession of Armbruster, alias Eggleston, was closed by the putting in possession of defendant as universal legatee. Plaintiff's recourse is against him alone."

Plaintiff's chief complaint is against the conclusions contained in this last paragraph, and it contends that it was entitled not only to a judgment against the succession, but also a recognition of its privileges, as undertaker, upon the movables and immovables composing the succession. Both of these claims appear to be well founded. In so far as plaintiff is concerned the precipitate closing of the succession is of no effect, and it cannot be deprived thereby of its right to secure judgment against the succession for a debt primarily incurred by the estate.

"We do not think that the fact that a succession has been placed under administration, and subsequent thereto the heirs have been recognized and placed in possession by an **ex parte** order of Court, has the force **per se**, of closing succession. We so held in **Succession of Bray**. If it were otherwise, heirs would have had furnished them a ready method of evading the law. Coming before any one else to a knowledge of the death of their ancestor, they could rush into court, open and immediately close a succession by an order, without a single act of administration having been done, while the succession was under administration, which seems to have been the case in this succession. We think the law-maker

— 481 —

contemplates, so far as the relations between creditors of the succession and the heirs are concerned, that the former should be accorded a period of three months from the time of the unconditional acceptance of the heirs in which to institute suits on their claims, and that the heirs cannot cut this right off by being placed in possession under an **ex parte** order of Court. * * * It is said that an heir who has accepted under benefit of inventory, is at liberty, at any time, to accept unconditionally; that, in fact, he may, under differing circumstances, be forced into that position independently of his consent. That is true, but he cannot do this to the injury of creditors who have relied upon his status as being that of an heir under benefit of inventory. The change from beneficiary to unconditional heirship is generally by way of infliction of penalty and loss, instead of acquisition of rights. **Blondeau, Separation des Patrimonies, 510, 511, and notes.''**

**Succession of Hart, 52 An. 374.**

It is claimed that plaintiff's privileges as undertaker is lost through the judgment putting the legatee in possession, and that the remedy that plaintiff should have applied for was the technical action for ''Separation of Patrimony,'' under Articles 1444, 1464, R. C. C., and Article 3275, R. C. C.

In the present instance, however, the necessity for this technical action has been dispensed with; for where an estate has been placed under administration and an inventory has been taken, this, in itself, accomplishes the very purpose of a suit for separation of patrimony by segregating the succession property from that of the heir.

''It has been held that the placing of an estate

under the administration of an administrator has the effect, **per se**, of operating a separation of patrimony. Under the present laws a succession under an executor is closely assimilated to one under an administrator."

> Succession of Hart, 52 An. 373; Baudy Lacantinerie et Wahl—des Succession, Vol. III, Secs. 3102 et seq.

Such administration, likewise, dispenses with the necessity of inscribing or registering the privilege claimed as required by **R. C. C., Art. 3275:**

> "Dans l'opinion générale, cette inscription ne serait pas nécessaire, lorsque la succession a été acceptée sous bénéfice d'inventaire, soit par tous les héritiers, soit par l'un d'entre eux, ou même lorsqu'elle est vacante \* \* \* \* D'après une jurisprudence constante suivie par la majorité des auteurs, l'acceptation sous bénéfice d'inventaire rend inutile et par suite irrecevable une demande de séparation des patrimoines de la part des créanciers. Cette séparation constitue pour eux un droit acquis, dont ils ne peuvent plus être privés par le fait d'inhéritier. Si donc celui-ci renonce au bénéfice d'inventaire, s'il en est déchu, \* \* \* \* les créanciers n'en conservent pas moins le droit de se prévaloir de leur privilége, sans avoir besoin de remplir aucune condition de publicité."

> Baudry Lacantinerie, Des Privileges, Etc., Vol. I, Sec. 862.

> "Suivant une jurisprudence constante l'acceptation d'une succession sous bénéfice d'inventaire entraine de plein droit la séparation des patrimoines au profit des créanciers de la succession et des légataires sans qu'ils aient besoin de former une demande en justice, ni de prendre inscription sur les immeubles de la succession dans le delai de six mois."

> Dalloz, Nouveau Code Civil, Vol. I, pp. 245-6.

> "Suivant un autre système, qui a prévalu en jurispru-

dence, le privilége de la séparation des patrimoines continue de subsister malgré la perte de bénéfice d'inventaire. résultant, soit de ce que l'héritier bénéficiaire a renoncé à ce bénéfice en faisant acte d'héritier pur et simple, soit de ce qu'il a été condamné en cette qualité."

**Ib., Sec. 165, p. 245.**

The provisions of the French Code are substantially the same as our own, and it follows that the judgment appealed from must be amended so as to recognize the liability of the succession as well as the existence of the privilege claimed.

It is, therefore, ordered that the judgment appealed from be amended and to that end that there now be judgment in favor of the plaintiff against the **Succession of Grace Mentez**, Widow of Charles G. Eggleston, also known as Mrs. Armbruster, as well as against F. Willaim Armbruster, in the full sum of three hundred and twenty-six dollars ($326.00) with legal interest thereon from judicial demand and costs of both courts, and with recognition of plaintiff's lien and privilege, as against said defendants, upon the movables and immovables inventoried in said succession as belonging thereto, and particularly upon the real estate described therein; and, as thus amended, the judgment is affirmed.

Judgment amended.